UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IRMA DALTON AND BLANCHE DALTON d/b/a SIDNEY 39 LTD,

Plaintiffs,

-against-

HARLEYSVILLE WORCESTER INSURANCE COMPANY and the HARLEYSVILLE GROUP,

Defendant.

---

**OPINION AND ORDER**
05-CV-2020(DLI)(VVP)

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiffs Irma Dalton and Blanche Dalton, doing business as Sidney 39, Ltd. ("the Daltons") have sued their property insurer, Harleysville Worcester Insurance Company, and its parent, the Harleysville Group (collectively refereed to as "Harleysville") for breach of contract and for a declaratory judgment seeking to force Harleysville to pay for damage to property located at 39 Sidney Place, Brooklyn, New York ("the Property"). Harleysville has moved for summary judgment on the Daltons' claims. The Daltons have cross-moved for summary judgment on their breach of contract claim. For the reasons set forth below, Harleysville's motion for summary judgment is granted and that of the Daltons is denied.

## I. Facts

The Daltons own the Property, which is designated as 39 Sidney Place, Brooklyn, New York. Harleysville's Local Rule 56.1 Statement ("Def. Rule 56.1 Stat."), ¶ 2. On May 23, 2003, the Daltons insured the Property by purchasing "Deluxe Business Owners" insurance policy, Policy

Number BO-3E0363 ("the Policy") from Harleysville. A copy of the Policy is annexed to the Affirmation of Henry J. Cernitz ("Cernitz Aff.") as Exhibit A. The Policy was in effect from August 3, 2003, to August 3, 2004. *See* Complaint, annexed to the Affidavit of Patricia A. Rooney ("Rooney Aff.") as Exhibit A.

On February 25, 2004, a substantial impairment of the structural integrity of an "interior common party wall" separating the Property and an adjacent property occurred.[1] The Daltons' Rule 56.1(a) Statement ("Pl. Rule 56.1(a) Stat."), ¶ 17. The Daltons immediately reported the impairment to Harleysville. *Id.* at ¶ 18.

Other than reporting the impairment to Harleysville, the Daltons do not appear to have taken any additional action– including repairing the Property. On April 2, 2004, Tom Van Staey of Walter B. Melvin Architects, LLC ("WBM") wrote to the Daltons and warned that the impairment created "a very real possibility that these buildings could collapse at any time."[2] Affidavit of Benjamin A. Lavon in Support of the Dalton's Cross-Motion ("Lavon Aff."), ¶ 8. On April 14, 2004, WBM wrote to the New York City Department of Buildings and requested that the Property be declared

---

[1] The Daltons continually refer to the impairment of the structural integrity of the party wall as a "collapse" although the wall remained standing at all times, and never actually fell or was reduced to rubble. As noted below, the Daltons' contention that the impairment of the structural integrity of the wall is tantamount to a "collapse" is not supported by New York law nor the terms of the Policy.

[2] Although not discussed by either party, it appears that WMB was retained as a result of litigation instituted by the New York City Department of Buildings against the Daltons. According to a letter by WMB to Patricia J. Lancaster, New York City's Buildings Commissioner, on March 24, 2004, Judge Muriel Hubsher of New York State Supreme Court, Kings County, "assigned [WMB] as the architect in charge of designing the urgent repair work of the party wall and front facades of 39-41 Sidney Place." Lavon Aff., Exhibit 3. Interestingly, the letter also notes that the New York City Department of Buildings previously requested that the Daltons shore up the Property, but they failed to do so. *Id.*

structurally unsafe and the tenants removed. *Id.* at ¶¶ 9-10. On May 14, 2004, WBM again wrote to the Daltons to advise them that the Department of Buildings would be issuing a vacate order for the Property. The letter further requested that the Daltons assist in the removal of the tenants occupying the Property, and that the Daltons execute several contracts to shore up the party wall to prevent against an actual collapse. *Id.* at ¶ 12; Lavon Aff. Exhibit 5. Apparently the Daltons did not cooperate in removing the tenants and, on June 10, 2004, the Department of Buildings issued a vacate order. *Id.* at ¶¶ 12-14; Lavon Aff. Exhibits 6-7. The emergency evacuation was necessary in case the Property or parts of it collapsed during the work to shore up the party wall. *Id.*

Meanwhile, Harleysville conducted its own investigation and dispatched both an engineer and a claims adjuster. Pl. Rule 56.1(a) Stat., ¶ 21. Harleysville's engineer found that the cause of the impairment was

> severe deterioration and rotting of a wood supporting plate placed along a level of the floor beams for the entrance level. Due to the rotted and deteriorated wood plate, there was movement in the common brick party wall. The result was weakness, tension and shifting of the building.

*Id.* at 22; Cernitz Aff., Exhibit C. On June 2, 2004, Harleysville disclaimed converge of the loss based on their engineer's report. *Id.* Specifically, Harleysville's disclaimer letter was based on Sections B.2.k. and B.3.c. of the Policy. Pl. Rule 56.1(a) Stat., ¶¶23-24; Cernitz Aff. Exhibit. A. Sections B.2.k. and B.3.c. of the Policy are discussed in greater detail below.

After Harleysville disclaimed coverage, the Daltons retained their own expert, Benjamin Lavon. Pl. Rule 56.1(a) Stat., ¶ 26. Lavon, a licenced engineer, conduced field observations on June 15, 2004, and July 7, 2004. *Id.* During these visits, Lavon observed that the party wall exhibited a "large bulging . . . movements, deteriorated masonry and crumbling mortar joints." Lavon Aff. ¶ 19.

Lavon also observed that much of the deterioration of the mortar joints was hidden from view and was only revealed when he cut into the wall. *Id.* A laboratory report subsequently confirmed that the mortar had deteriorated. *Id.* at ¶ 20.

As part of this litigation, Lavon issued an expert report on March 29, 2006. A copy of the report is annexed to the Cernitz Aff. as Exhibit. A. The report observed that "the said failed party wall exhibited large bulging of the masonry wall, movements, deteriorated masonry and crumbling mortar joints. The wall bulging was estimated to be as much as approximately 12 inches." *Id.* Lavon estimated the party wall is approximately nine inches thick and that the fount masonry wall had separated from the party wall by "as much as two inches." *Id.* Lavon went on to state that "the client has reported that, the structural conditions were discovered only after the party wall finishes were removed. Until that time the masonry bearing wall remained concealed to them." *Id.* Lavon concluded that

> the deterioration of the mortar joints that resulted in the collapse of the Party Wall was hidden from view because the Party Wall was completely covered with finish that remained in place until it was uncovered. Thus, there is no doubt that it was impossible for anyone to have known or seen that the mortar joints were deteriorating prior to the time that the wall finish was removed.

*Id.* Lavon concluded that "the structural failure of the Party Will resulted from deteriorated mortar joints." Lavon Aff. ¶ 21.

## II. Discussion

<u>Summary Judgment Standards</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). However, the nonmoving party "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997) (internal quotation marks omitted). Where interpretation of a contract is at issue, "[s]ummary judgment is generally proper . . . only if the language of the contract is wholly unambiguous." *Compagnie Financière de CIC et de L'Union Européenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "A court may also grant summary judgment regarding the interpretation of ambiguous language if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Id*. at 158.

Relevant Policy Provisions

The Policy contains several provisions relevant for the determination of these motions. First, Section A.3 of the Policy, entitled "Covered Causes of Loss" states that a covered cause of loss is "Risk of Direct Physical Loss unless the loss is (a) Excluded in Section B. Exclusions; or (b) Limited in Paragraph A.4., Limitations, that follow." *See* Policy, p. 2, Cernitz Aff. Exhibit. A. The parties agree that Paragraph A.4.'s limitations do not apply.

There is a dispute, however, regarding the applicability of Section B of the Policy, entitled "Exclusions." Specifically, Harleysville contends that Section B.1.k. of the Policy excludes coverage of the loss suffered by the Daltons. Cernitz Aff. ¶ 6. Section B.2.k. of the policy reads as follows:

B. Exclusion

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

***

k. Other types of loss

(1) Wear and tear

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes property to destroy itself;

***

(4) settling, cracking, shirking or expansion.

***

But if loss or damage by the "specified causes of loss"or building glass breakage results, we will pay for that resulting loss or damages.

*See* Policy, pp. 7-9, Cernitz Aff. Exhibit. A. The Daltons do not dispute the existence of this exclusion. Pl. Rule 56.1(a) Stat., ¶ 13.

The Daltons believe that the Section B.2.k. is not applicable because the loss is covered under Section A.5.d. which provides for additional coverage for "collapse." *See* Policy, pp. 2-3, Cernitz Aff. Exhibit. A. Section A.5.d. reads as follows:

d. collapse

we will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following:

***

(3) Hidden decay

***

Collapse does not include settling, cracking, shrinkage, bulging or expansion.

*Id;* Pl. Rule 56.1(a) Stat., ¶ 7.

Harleysville asserts that it is entitled to summary judgment under Section A.5.d. because the Daltons' expert report indicates that the loss was caused by "bulging" and that bulging is not considered collapse, placing the loss squarely within the B.2.k. exclusion since the real cause of the impairment was deterioration of the party wall. Harleysville concedes that it has the burden of proving that its interpretation of the policy is the only reasonable one. *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1000 (2d Cir. 1974).

Collapse Under New York Law

The opinions cited by the parties and reviewed by the court express two different views on what constitutes "collapse" under the type of insurance policy at issue in this case. *See What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy*, 71 A.L.R.3d 1072 (1976). The Daltons contend that the term "collapse" should be liberally construed to encompass any condition which creates a "substantial impairment of the structural integrity of a building." *Royal Indem. Co. v. Grunberg,* 155 A.D.2d 187 (3rd Dep't. 1990). Harleysville, for its part, contends that the policy, although it covers collapse, specifically excludes collapse caused by "bulging," and, as a matter of New York law, collapse in the Policy is therefore narrowly defined by its plain meaning of "total or near total destruction." *See Graffeo v. U.S. Fidelity & Guaranty Co.,* 20 A.D.2d 643 (2nd Dep't. 1964).

In the recent case of *Rector St. Food Enterprises, Ltd. v. Fire & Cas. Ins. Co. of Connecticut,* 35 A.D.3d 177 (1st Dep't. 2006), the policy, by its very terms, limited collapse to "abrupt falling down or caving in" and further stated that "[a] building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling,

shrinkage or expansion." *Id.* The court found, therefore, that the "two-to three-inch-wide cracks in [the building's] facade . . . sinking, out of plumb and leaning" did not constitute collapse under the policy because the policy only insured against the total destruction of the building. *Id.* The causes of total destruction, such as bulging, sagging, bending, leaning, settling, shrinkage or expansion, were not insured under the policy.[3] Although the language of the Policy is different from the policy at issue in *Rector Street*, the intent of the language is the same. As in *Rector Street*, the policy here insured the Daltons against collapse of the Property, but not the causes of collapse.

This court's holding is based on the fact that the more narrow definition of collapse found in *Graffeo* is the law in New York. As Harleysville points out, the Court of Appeals dismissed the appeal in *Graffeo*, thus tacitly accepting the Second Department's narrow definition of "collapse." *See Graffeo v. U. S. Fidelity & Guar. Co.,* 14 N.Y.2d 685 (1964). *Grunberg's* expansive definition was never tested by a motion for leave to appeal to the Court of Appeals, and *Rector Street*, a very recent case, adopted the narrow definition of *Graffeo*, partially for that reason. *See Rector St. Food Enterprises, Ltd.* 35 A.D.3d at 178.

The court is bound by the decisions of New York's intermediate courts unless the court believes that the Court of Appeals would reach a different conclusion. *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999) ("we are bound . . . to apply the law as interpreted by New

---

[3] Both sides attempt to use *Bailey v. Hartford Fire Ins. Co.,* 565 F.2d 826 (2d Cir. 1977) as support for their respective definitions of "collapse." In *Bailey,* the court held that "there is nothing in the law of New York, as we have searched it, that requires the insured property be demolished nor reduced to rubble." *Id.* at 830. The court preferenced this assertion by noting that "'collapse,' as written in the context of homeowner's coverage, means a sudden impact that is destructive of the structural integrity of the insured building." *Id.* Here, the engineer's report states that the destruction which cased the impairment had been present for a number of years: there was nothing sudden about it. Cernitz Aff., Exhibit A; Lavon Aff. Exhibit 1. Therefore, the facts of this case are inapposite to *Bailey* and *Bailey* supports neither Harleysville's nor the Daltons' assertions.

York's intermediate appellate courts . . . unless we find persuasive evidence that the New York Court of Appeals, which has not ruled on this issue, would reach a different conclusion."); *Entron, Inc. v. Affiliated FM Insurance Co.*, 749 F.2d 127, 132 (2d Cir. 1984) ("we recognize that the decision of an intermediate state court on a question of state law is binding on us unless we find persuasive evidence that the highest state court would reach a different conclusion."). In this case, the court has no reason to believe that the Court of Appeals would reach a different conclusion than was reached, independently, by the First Department in *Rector St.* and by the Second Department in *Graffeo.*

Harleysville's reading of the contract as excluding coverage for the *causes* of a collapse, but not for the collapse itself, is the only reasonable reading. The Daltons purchased an insurance policy which insured them against a collapse caused by "hidden decay" but explicitly did not insure them against bulging caused by hidden decay, which is exactly what the Daltons' own expert reported was the cause of the structural impairment. Equating bulging with collapse, which is what the Daltons are asking the court to do, is an unreasonable reading of the Policy. In fact, Section B.2.k. specifically excludes losses from coverage caused by "settling cracking, shrinking or expansion." When the court reads Section B.2.k. together with Section A.5.d., the only reasonable conclusion is that the Policy insures against collapse, itself, but not imminent collapse and certainly not against the causes of imminent collapse.[4] *See, e.g., Klein's Moving & Storage, Inc. v. Westport Ins. Corp.,*

[4] The court is sympathetic to the Daltons' argument that public policy considerations weigh in favor of forcing insurers to pay for imminent collapse, thus preventing the insured from deferring necessary maintenance. However, the court is confident that any responsible insured would not risk total destruction of the insured property and death or injury of its occupants – and the substantial potential liability – simply to collect on an insurance policy. *See Rector St. Food Enterprises, Ltd.*, 35 A.D.3d at 178.

196 Misc.2d 735 (Sup. Ct. N.Y. Co. 2003) (holding that "given the undisputed facts presented and the unambiguous intent of the policy" the inured suit to recover for a loss not covered under the policy should be dismissed). The Daltons did not purchase a policy which insured them against necessary maintenance to the property– even in the event of imminent collapse– and it would be inequitable for the court to impose such a requirement on Harleysville.

When there are no material questions of fact related to content of an insurance policy, and the policy's provisions are clear and unambiguous, the interpretation of an insurance contract is a question of law for the courts to determine. *Fanger v. Manhattan Life Ins. Co. of New York, N.Y.,* 273 A.D.2d 438 (2d Dep't. 2000). Because the Policy is clear and unambiguous, and neither party has presented any issues of fact to preclude summary judgment, the court finds, as a matter of law, the Daltons' loss was not covered by the Policy.

Harleysville's Disclaimer Letter

The Daltons assert that Harleysville must pay their claim on the highly technical ground that Harleysville did not cite the bulging exception of Section A.5.d. of the Policy as a reason to disclaim coverage in its disclaimer letter of June 2, 2004. *See* Cernitz Aff., Exhibit C. Indeed, the disclaimer letter relies on Section B.1.k. and Section B.3.c., but not A.5.d. The letter further states that "neither this letter, nor any investigation undertaken by [Harleysville] is intended to waive any rights of either party under the policy." *Id.*

Under New York law, an insurer is entitled to rely on an exclusion not mentioned in the disclaimer letter unless an insured can "show either that [the insurer] waived this ground for denying coverage or that she would be prejudiced if [the insurer] was permitted to assert it as a new ground for denying coverage." *Brown v. State Farm Ins. Co.,* 237 A.D.2d 476 (2nd Dep't. 1997). By the

very terms of the letter, Harleysville has not waived its right to disclaim coverage under Section A.5.d.

Here, the issue is whether Harleysville should be able to disclaim coverage on a ground not asserted in its disclaimer letter. The Daltons have not been prejudiced by Harleysville invoking the building exception in their motion for summary judgment, and therefore Harleysville is entitled to do so. This is not a case where the defendant is attempting to invoke an affirmative defense not raised in the disclaimer letter. *See Benjamin Shapiro Realty Co. v. Agricultural Ins. Co.,* 287 A.D.2d 389 (3rd Dep't. 2002).

The only prejudice asserted by the Daltons is that, had they known that Harleysville would rely on the bulging exclusion to Section A.5.d., they would have postured their litigation in such a way to avoid exposing the unfortunate fact that the loss was caused by bulging and was therefore excluded from coverage. It would be quite a stretch for the court to construe exposing a harmful fact – by the party's own expert, no less – as creating prejudice.

## III. Conclusion

For the reasons set forth above, Harleysville's motion for summary judgment is granted and the Dalton's cross-motion for summary judgment is denied. The complaint is dismissed.

SO ORDERED.

DATED: Brooklyn, New York
July 23, 2007

_______________/s/_________________
DORA L. IRIZARRY
United States District Judge